[No. 71858-0.   En Banc.]

Argued October 15, 2002.    Decided February 6, 2003.

BASIL DENAXAS, ET AL., *Petitioners*, v. SANDSTONE COURT OF BELLEVUE, L.L.C., *Respondent*, KIDDER, MATHEWS & SEGNER, INC., ET AL., *Defendants*, PACIFIC NORTHWEST TITLE COMPANY OF WASHINGTON, INC., *Petitioner*.

*Thomas F. Peterson* (of *Betts Patterson Mines*), for petitioner Pacific Northwest Title Company of Washington, Inc.

*M. Gerald Herman* (of *Herman, Recor, Araki, Kaufman, Simmerly & Jackson*), for petitioners Basil and Ruth Denaxas.

*John K. Wheeler* and *Douglas A. Hoffman* (of *Williams, Kastner & Gibbs, P.L.L.C.*), for respondent Sandstone Court of Bellevue, L.L.C.

*Linda B. Clapham* and *Emilia L. Sweeney* (of *Lane Powell Spears Lubersky, L.L.P.*), for respondent James Klinger.

IRELAND, J. — Basil and Ruth Denaxas (collectively Seller) brought this action against Sandstone Court of Bellevue, L.L.C., assignee of Singleton Associates[1] (collectively Purchaser), for failure to pay on a promissory note in a real estate transaction. Purchaser counterclaimed against Seller and filed third party claims against Kidder, Mathews & Segner (Realtor)[2] and Pacific Northwest Title Company of Washington, Inc. (Title Company). The trial court

---

[1] Three separate corporations make up Singleton Associates (Singleton Associates—Architecture, Singleton Associates—Construction, and Singleton Associates—Management), and all of them work together on real estate development projects.

[2] Realtor did not seek review by this court of the Court of Appeals decision.

granted summary judgment against Purchaser, which was reversed by the Court of Appeals in an unpublished opinion. *Denaxas v. Sandstone Court of Bellevue, L.L.C.*, noted at 107 Wn. App. 1055 (2001). The Title Company and Seller petitioned this court for review, and we granted the petition. Finding that the Title Company did not breach its duty to Purchaser and that Purchaser had constructive knowledge of the correct legal description and the correct square footage at the time of closing, we reverse the Court of Appeals and reinstate the trial court's grant of summary judgment of dismissal.

## FACTS

Seller owned commercial property in downtown Bellevue, Washington. Mark McAlister, an agent with Realtor, approached Seller in late 1997 about selling their property. Seller told McAlister that they owned two lots and a strip of a third (Denaxas property) and expressed willingness to consider offers. Seller also mentioned receiving an offer of $1.8 million in the 1980s, but McAlister told them they probably should not expect quite as much in the then current market.

McAlister's associate, James Klinger, contacted his longtime client, Lee Singleton, an architect and real estate developer. Singleton is the sole shareholder of Singleton Associates and one of five managers of Sandstone Court of Bellevue. When Singleton expressed his interest, Klinger prepared a purchase and sale agreement (Agreement). Because the online search McAlister performed reflected that Seller owned three full lots, Klinger inserted in the opening paragraph an erroneous legal description of the Denaxas property and an erroneous approximation of the square footage. The opening paragraph, with the underlined text inserted in a form agreement, read as follows:

The undersigned Buyer, *The Singleton Associates—Management*, agrees to buy and Seller agrees to sell, on the following terms, the real property and all improvements thereon (collectively, the "Property") commonly known as *approximately 27,260 square feet of land and improvements at 10955 N.E. 4th Street*, in the city of *Bellevue, King* County, Washington, legally

described as: *Lots 3, 8, and 9 Summit Ridge Addition to Bellevue*

(Buyer and Seller authorize the Listing Agent, Selling Licensee, or Closing Agents to insert and/or correct, over their signatures, the legal description of the property.)

Clerk's Papers (CP) at 22. During negotiations, Seller had no discussions with either Purchaser or the two agents regarding square footage or price per square foot.

In November, Seller and Purchaser reached a mutually agreeable price of $1.6 million and executed the Agreement. The Agreement allowed 10 days for Purchaser to notify Seller of any objectionable matters in the title commitment, 120 days to give written notice to Seller of the removal of contingencies, and not more than 360 days to close the sale.

Preclosing

Following execution of the Agreement, Purchaser engaged the Title Company to perform a preliminary title report. The Title Company's report, effective November 14, 1997, contained the correct legal description on the second page:

PARCEL A:

Lot 3, Summit Ridge, according to the plat thereof recorded in Volume 47 of Plats, page 17, in King County, Washington.

PARCEL B:

Lot 9 and the east 26 feet of Lot 8, Green's Bellevue Addition, according to the plat thereof recorded in Volume 42 of Plats, page 37, in King County, Washington; EXCEPT the north 4 feet thereof.

CP at 408-09. This report was sent to both Singleton and Realtor. However, neither party noted the discrepancy in the legal descriptions found in the Agreement and the title report. In fact, Singleton claimed he read only the "exceptions" section and did not look specifically at the legal description.

In December 1997, Singleton Associates entered into a purchase and sale agreement with the owners of an adjoin-

ing lot of 8,060 square feet (McDermott property).[3] The site area of the Sandstone Court project included the McDermott property and the Denaxas property.

Singleton visited the Denaxas property on a number of occasions, but said he could not ascertain its boundaries or square footage from a visual inspection. In March 1998 Purchaser ordered a survey. Purchaser provided the surveyor with the correct legal description. The survey, completed in April, revealed that the combined square footage of the Denaxas property and the McDermott property was 28,195, only 935 square feet more than the incorrect approximation of the Denaxas property alone. Although the total number would have been over 35,000 square feet had the approximation in the Agreement been correct, Singleton said he did not notice the error because the survey went "straight to Ted Panton, the architect on the project." CP at 573. Singleton did not review the survey.

In August 1998, Purchaser submitted a description of proposal to the city of Bellevue. The proposal included the correct square footage from the survey.

In November 1998, the transaction closed. The escrow instructions, which were signed by Singleton for Purchaser and by Seller, included the representation that

> [t]he undersigned PURCHASER and SELLER have received, reviewed and approved for use in this escrow the preliminary commitment for title insurance, including any supplementals thereto and *have reviewed and approved the legal description* and general and special exceptions including the covenants, conditions and restrictions affecting said property as stated on the commitment.

Attach. to Pet. for Review (emphasis added). An additional clause stated, "THE PURCHASER AND SELLER HAVE EXAMINED AND HEREBY APPROVE FOR USE IN THIS ESCROW THE ABOVE LISTED DOCUMENTS," which included the deed of trust. *Id.* The correct legal description

---

[3] The Purchaser did not discuss square footage or price per square foot in this transaction, either.

was included in the deed and deed of trust, which were on the Title Company's forms.[4] The Title Company did not expressly state that the legal description in the closing documents was different from the one in the Agreement.

Postclosing

Eight months later, in June 1999, Singleton became personally aware of the error in the square footage approximation when he attempted to get construction financing. The project architect informed him of the correct square footage of the Denaxas property. Purchaser contacted Seller in an attempt to lower the contract price. Seller refused. Purchaser stopped making the agreed payments to Seller.

PROCEDURAL HISTORY

Subsequently, Seller accelerated the note and sued Purchaser for failure to pay. Purchaser answered and counterclaimed against Seller for, inter alia, mutual mistake and breach of warranty. In addition, Purchaser, as third party plaintiff, sued the Title Company for breach of fiduciary duty and for negligence.

Seller and the Title Company moved for summary judgment against Purchaser. The trial court granted both motions and entered judgment in favor of Seller, dismissing Purchaser's counterclaims and third party claims. After its motion for reconsideration was denied, Purchaser appealed.

The Court of Appeals reversed the trial court, reinstating the mutual mistake counterclaim against Seller and the negligence and breach of fiduciary duty claims against the Title Company. *Denaxas*, noted at 107 Wn. App. 1055, slip op. at 2. The Title Company petitioned this court for review

---

[4] Although the first page of the deed of trust contained the summary legal description, the complete and correct legal description was incorporated by reference to an attached document. The Purchaser's argument that the deed of trust contained the "abbreviated" description and therefore "does not in itself alert a reader that the legal description is different," Reply Br. of Appellant at 17, ignores the meaning of "incorporation by reference," by which the attachment became part of the document.

and made a motion to supplement the record with the escrow instructions. Seller joined in the petition. This court granted the petition and granted the Title Company's motion to supplement the record with the escrow instructions. In its supplemental brief, Purchaser argued that the trial court erred in dismissing the breach of warranty claim, a claim the Court of Appeals did not reinstate or even discuss.

## ISSUES

Where there is a variance between a legal description in a purchase and sale agreement and the closing documents:

1.  Does an escrow agent have a duty to affirmatively advise a party of the difference?

2.  Under what circumstances may a purchaser be charged with constructive knowledge of the variance?

3.  May the doctrine of mutual mistake be invoked where a purchaser had constructive knowledge of the mistake before closing?

## ANALYSIS

A. Standard of Review

■■ An appellate court engages in the same inquiry as the trial court when reviewing an order of summary judgment. *Wilson v. Steinbach*, 98 Wn.2d 434, 437, 656 P.2d 1030 (1982). Summary judgment is appropriate if the pleadings, affidavits, depositions, and admissions on file demonstrate the absence of any genuine issues of material fact, and that the moving party is entitled to judgment as a matter of law. CR 56(c). The court must consider all facts submitted and all reasonable inferences drawn from them in the light most favorable to the nonmoving party. *Wilson*, 98 Wn.2d at 437. The court should grant the motion only if, from all the evidence, reasonable persons could reach but one conclusion. *Id.*

## B. Duty of Title Company

The Court of Appeals stated that, as a matter of law, the Title Company's failure to draw Purchaser's attention to the discrepancy between the Agreement and the closing documents was both a breach of fiduciary duty and a breach of the duty of reasonable care of an escrow agent. *Denaxas*, noted at 107 Wn. App. 1055, slip op. at 10. We reverse and hold that the Title Company did not have a duty to point out the discrepancy between the legal description in the Agreement and that in the closing documents.

### 1. Duty arising from escrow instructions

█ This court examined the duties of escrow agents in *National Bank of Washington v. Equity Investors*, 81 Wn.2d 886, 506 P.2d 20 (1973). There we said, "The escrow agent's duties and limitations are defined . . . by his instructions." 81 Wn.2d at 910. The tasks in the instructions must be undertaken with " 'ordinary skill and diligence, and due or reasonable care.' " *Id.* (quoting 30A C.J.S. *Escrows* § 8 (1965)). In addition, the escrow agent, as fiduciary to all parties to the escrow " 'must conduct the affairs with which [it] is entrusted with scrupulous honesty, skill, and diligence.' " *Id.*

The escrow instructions in this case do not include the duty to compare the documents for the purpose of unearthing any discrepancies. Nor do they indicate that the Title Company would be expected to locate and identify such discrepancies if it used reasonable care and the scrupulousness of a fiduciary in following its instructions. Moreover, Purchaser does not allege any deviation from the agreed-upon instructions. Therefore, Purchaser's claims under *Equity Investors* fail.

### 2. Duty arising from case law

We are not persuaded by Purchaser's argument that case law imposes a duty on the Title Company independent of the instructions. Purchaser relies upon *Hurlbert v. Gordon*, 64 Wn. App. 386, 824 P.2d 1238 (1992) to define an escrow agent's duty. In that case, an attorney for one of the parties

to a real estate transaction also acted as the escrow agent. He drafted the closing documents and submitted them to both parties for approval. Before closing, he also made certain changes to those documents. He sent the revised documents to the parties, but in the cover letter did not affirmatively indicate the changes he had made. The other party and its attorney had the opportunity to review the changed documents. At closing, the attorney-escrow agent did indicate an additional change he had made. The court acknowledged that an escrow agent has the duty to disclose, to both parties, all changes to closing documents. *See* 64 Wn. App. at 395. However, it held that an escrow agent is not required to discuss the documents and the nature of the changes to them paragraph by paragraph. *See id.*

*Hurlbert* is factually distinguishable from this case. In *Hurlbert*, the attorney-escrow agent was responsible for drafting the documents and had made changes to the documents he had drafted. Here, the Title Company did not prepare the Agreement or seek to change the legal description. Rather, the Title Company provided the correct legal description of the Denaxas property in the preliminary title report, as was its obligation. The escrow agent utilized the correct legal description in the closing documents as well. *Hurlbert* does not impose a duty on escrow agents to affirmatively identify differences between the closing documents and documents drafted by others.

Purchaser's reliance on *Bowers v. Transamerica Title Insurance Co.*, 100 Wn.2d 581, 675 P.2d 193 (1983), is also misplaced. Under *Bowers*, lay escrow agents are held to the standard of attorneys when they engage in the practice of law. 100 Wn.2d at 590. In that case, the conduct at issue was a lay escrow agent's preparation of legal documents, failure to inform the parties of the legal effect of the documents, and failure to advise the parties to obtain independent legal counsel. The lay escrow agent in that case was found to be engaged in the unauthorized practice of law by preparing legal documents.

■ *Bowers* does not inform the analysis here. Purchaser claims that the Title Company is engaged in the practice of law because it prepared the deed and deed of trust.[5] However, Purchaser does not allege that the Title Company's preparation of these documents did not meet the standard of care for an attorney. Instead, Purchaser complains that the Title Company did not alert Purchaser of the incorrect legal description in the Agreement, which was drafted by Purchaser's real estate agent. This, Purchaser insists, is *not* the practice of law.[6] The Title Company should not be held to the standard of care of an attorney for conduct that is not alleged to be the practice of law.

The Title Company did not breach its fiduciary duty or duty of reasonable care. Purchaser cannot show that the Title Company breached a duty express or implied in the escrow instructions. Nor can it show that the Title Company had a duty to notify Purchaser that the legal description in the Agreement was incorrect or different than in other documents. Because there is no genuine issue of material fact with regard to the Title Company's duty, summary judgment on the negligence and fiduciary duty claims was proper. Therefore, we reverse the Court of Appeals and affirm the trial court's grant of summary judgment in favor of the Title Company.

C. Constructive Knowledge

Citing the rule that knowledge of an agent is imputed to the principal if it is relevant to the agency, the Court of Appeals declined to impute constructive knowledge of the correct square footage to Singleton based on the project architect's actual knowledge. *Denaxas*, noted at 107 Wn. App. 1055, slip op. at 9 (quoting *Roderick Timber Co. v. Willapa Harbor Cedar Prods., Inc.*, 29 Wn. App. 311, 316-17, 627 P.2d 1352 (1981)).

---

[5] The Title Company denies having prepared the deed and deed of trust, although the documents are on its forms.

[6] The Court of Appeals agreed. *Denaxas*, noted at 107 Wn. App. 1055, slip op. at 10.

■ In order for an agent's knowledge to be imputed to the principal, an agent must have actual or apparent authority in connection with the subject matter " 'either to receive it, to take action upon it, or to inform the principal or some other agent who has duties in regard to it.' " *Roderick*, 29 Wn. App. at 317 (quoting RESTATEMENT (SECOND) OF AGENCY § 268 cmt. c (1958)). In *Roderick*, a corporate debtor argued that a creditor had notice he was dealing with a corporation, rather than an individual who could be held personally liable, because the debtor paid with corporate checks. The creditor's bookkeeper received and deposited the checks, but she was not an officer, acted only in a ministerial capacity, had no role in the transaction, and would not be expected to attach significance to the fact that the checks were from a corporation. The *Roderick* court found this insufficient to invoke the doctrine of constructive notice. *Id.*

■ In this case, the Court of Appeals stated that comparing the survey to the Agreement was not relevant to the project architect's agency. However, it is the project architect's knowledge of the square footage that may be imputed to Purchaser, rather than his knowledge of the difference between the Agreement term and the actual number. Here, the project architect did have the authority, unlike the bookkeeper in *Roderick*, to take action in connection with the square footage number and create a project that would fit the available land. He was in more than a ministerial position and would be expected to attach significance to the amount of square feet in the project. He submitted a plan to the city of Bellevue that contained the appropriate square footage number before closing.[7] That he may not have known the specific square footage of each lot is immaterial. His knowledge of the correct information was well within the scope of his agency, and it should be imputed to Singleton and, therefore, to Purchaser.

---

[7] Despite this, the Court of Appeals found that there was no evidence that the project architect had actual knowledge of the square footage before closing. *Denaxas*, noted at 107 Wn. App. 1055, slip op. at 9-10.

■■■ Even without the imputed knowledge of the project architect, Purchaser had constructive knowledge of both the correct square footage and legal description. If a person exercising reasonable care could have known a fact, he or she is deemed to have had knowledge of that fact. *Noyes v. Parsons*, 104 Wash. 594, 599-600, 177 P. 651 (1919); BLACK'S LAW DICTIONARY 876 (7th ed. 1999) (defining constructive knowledge).

Allowing Purchaser to avoid its contractual promises here would be rewarding selective ignorance. Purchaser had the survey several months before closing, but Singleton did not review it. Had Singleton reviewed the survey, he would have noted that the square footage of the full project amounted to less than 1,000 square feet more than he believed the Denaxas property alone comprised. Similarly, Purchaser received and reviewed the preliminary title report almost a year before closing, but Singleton did not look at the legal description contained in it. In spite of this, he represented to Seller and the Title Company that he had reviewed and approved the legal description when he signed the escrow instructions. Moreover, Purchaser used the correct information in documents submitted to others.

Purchaser had ample opportunity to read the survey, title reports, and closing documents. Had Purchaser exercised reasonable care, it could have known their contents. Purchaser is charged with that knowledge. Therefore, we reverse the Court of Appeals and hold that Purchaser is charged with knowledge of not only the correct square footage but also the correct legal description of the Denaxas property.

D. Counterclaims against Seller

1. Mistake

The Court of Appeals reinstated Purchaser's mutual mistake counterclaim, citing Purchaser's mistaken belief about the size of the Denaxas property and Seller's duty to inform Purchaser that the information in the Agreement was inaccurate. *Denaxas*, noted at 107 Wn. App. 1055, slip op. at 11-12.

██ ██ The elements of mistake are as follows.[8] "A mistake is a belief not in accord with the facts." *Simonson v. Fendell*, 101 Wn.2d 88, 91, 675 P.2d 1218 (1984). The belief must be held at the time the contract is made. *See id.* The mistake must relate to a basic assumption on which both parties relied when making the contract. *Pub. Util. Dist. No. 1 of Lewis County v. Wash. Pub. Power Supply Sys.*, 104 Wn.2d 353, 362, 705 P.2d 1195, 713 P.2d 1109 (1985). It must have a material effect on the agreement. *See Seattle Prof'l Eng'g Employees Ass'n v. Boeing Co.*, 139 Wn.2d 824, 832, 991 P.2d 1126, 1 P.3d 578 (2000) (hereinafter *SPEEA*). Finally, a party may invoke the mistake doctrine only if the party did not bear the risk of mistake. *Pub. Util. Dist. No. 1*, 104 Wn.2d at 362.

██ A party with constructive knowledge of the circumstances giving rise to the alleged mistake does not hold a belief not in accord with the facts. Other jurisdictions have held that constructive knowledge precludes reformation or rescission of a contract. *See, e.g., Hoff v. Sander*, 497 S.W.2d 651 (Mo. Ct. App. 1973) (rescission); *Hartle v. United States*, 22 Cl. Ct. 843 (1991) (same); *C&L Constr. Co. v. United States*, 6 Cl. Ct. 791 (1984) (reformation). In *Hoff*, the parties entered into a land lease believing that the use intended by the lessees was permitted by the zoning laws. In fact, the laws prohibited that use. The court considered both actual and constructive knowledge of the parties. Because contracting parties are charged with knowledge of the law, the court held that the plaintiffs could not claim that they were mistaken about the allowable uses. *Hoff*, 497 S.W.2d at 653. The *Hoff* court reversed the trial court's grant of rescission. *Id. See also Hartle*, 22 Cl. Ct. at 849 (holding that real estate purchasers charged with knowledge of zoning laws and facts in public records were not able to rescind the contract based on mutual mistake).

██ The same reasoning applies in this case. Purchaser is charged with constructive knowledge of the cor-

---

[8] The elements of mistake in Washington jurisprudence closely follow those in the *Restatement (Second) of Contracts* §§ 151-53 (1981).

rect square footage and the correct legal description. It is true that, when viewed in the light most favorable to Purchaser, the facts indicate that Purchaser held a mistaken belief at the time of entering into the Agreement in November 1997. Purchaser believed the Denaxas property comprised three full lots and 27,260 square feet. However, in the eyes of the law, Purchaser knew the accurate measurements and description of what it was buying by the time of closing, as discussed above. Therefore, Purchaser did not hold a mistaken belief at the time of entering into the note and deed of trust in November 1998, when the sale of the Denaxas property was consummated.

Our jurisprudence has held that a party's negligence in failing to discover the facts or read the writing to be certain it is correct need not bar the remedy of reformation in the case of mistake. *Wash. Mut. Sav. Bank v. Hedreen*, 125 Wn.2d 521, 529-31, 886 P.2d 1121 (1994). Nevertheless, reformation is not available to Purchaser in this case. Reformation is an equitable remedy employed to bring a writing that is materially at variance with the parties' agreement into conformity with that agreement. *Akers v. Sinclair*, 37 Wn.2d 693, 702, 226 P.2d 225 (1950). A party may seek reformation of a contract if (1) the parties made a mutual mistake or (2) one of them made a mistake and the other engaged in inequitable conduct. *Hedreen*, 125 Wn.2d at 525. "However, reformation is justified only if the parties' intentions were identical at the time of the transaction." *SPEEA*, 139 Wn.2d at 832-33. The party seeking reformation must prove the facts supporting it by clear, cogent and convincing evidence. *Akers*, 37 Wn.2d at 703; *Kaufmann v. Woodard*, 24 Wn.2d 264, 269, 163 P.2d 606 (1945).

In *SPEEA*, Boeing had a long-standing practice of having an unpaid orientation day before starting some of its employees. Boeing sent letters to prospective employees stating that they would be put on the payroll after the orientation day. Later, the Washington State Department of Labor and Industries determined that the orientation constituted work, and employees brought suit. They claimed

that their employment contracts should be reformed to compensate them for the orientation based on the mistaken belief that the orientation activities were not work. This court would not grant the employees reformation because their intentions were not identical to Boeing's. *SPEEA*, 139 Wn.2d at 833. The court held that "[al]though some of the employees may have expected compensation for attending orientation, this expectation was never communicated to Boeing. Additionally, it is clear from the record Boeing never intended to pay for orientation and communicated this fact to the employees." *Id.*

The record in this case indicates that Purchaser and Seller shared the identical intention of transferring the Denaxas property, an intention that was not precisely reflected in the agreement. However, Purchaser's principal concern is reformation of the purchase price. Purchaser contends that it formulated a price offer based on square footage. However, it never communicated this intent to Seller. Purchaser cannot show by clear, cogent, and convincing evidence that Seller shared this intent. This court cannot rewrite a contract to force a bargain that the parties never made. *See Childers v. Alexander*, 18 Wn. App. 706, 710-11, 571 P.2d 591 (1977). Therefore, reformation is not appropriate in this case.

We reverse the Court of Appeals and hold that because Purchaser had constructive knowledge of the true facts at the time of closing the transaction, it may not invoke the doctrine of mutual mistake. As there is no genuine issue of material fact regarding Purchaser's mistaken belief at the time of closing, summary judgment on Purchaser's mutual mistake claim is appropriate. We also hold that reformation is not a proper remedy because Purchaser cannot show an identical intention of the parties. Therefore, we reverse the Court of Appeals and affirm summary judgment in favor of Seller on reformation.

2. Breach of warranty claim

■ The trial court dismissed Purchaser's other counterclaims against Seller, one of which was a breach of war-

ranty claim. This counterclaim was not analyzed by the Court of Appeals. Purchaser did not raise this issue until its supplemental brief. Under the Rules of Appellate Procedure, "the Supreme Court will review only the questions raised in . . . the petition for review and the answer, unless the Supreme Court orders otherwise upon the granting of the . . . petition." RAP 13.7(b). As Purchaser did not raise this issue in its answer and the court did not extend review to other counterclaims the trial court had dismissed, it is not within the scope of this court's review.

E. Attorney's Fees

The promissory note contains the provision, "If action be instituted on this note, [Purchaser] promise[s] to pay such sum as the court may fix as attorney's fees." CP at 52. On summary judgment, Seller was awarded attorney's fees. Seller requested attorney's fees on appeal, but did not receive them because they were not the prevailing party. *Denaxas*, noted at 107 Wn. App. 1055, slip op. at 12.

■■■ The Rules of Appellate Procedure require that the party seeking attorney's fees "devote a section of the brief to the request for the fees or expenses." RAP 18.1(b). None of the briefs mentioned attorney's fees. Therefore, Seller is not entitled to attorney's fees on appeal. Those awarded by the trial court are reinstated.

CONCLUSION

The trial court's grant of summary judgment in favor of the Title Company and Seller was proper. Title Company had no duty to draw purchaser's attention to the discrepancy between the incorrect legal description in the Agreement and the correct one in the closing documents. Therefore, Purchaser cannot maintain a claim for negligence or breach of fiduciary duty. Purchaser received and used the correct square footage and legal description of the Denaxas property long before closing, and thus is charged with constructive knowledge of both.

As Purchaser had constructive knowledge of the correct information before closing, there was no mistaken belief at the time of purchasing the Denaxas property to support a mutual mistake claim. Finally, Purchaser cannot show by clear, cogent, and convincing evidence that the parties' intentions as to price were identical, which precludes reformation of the contract. Accordingly, the decision of the Court of Appeals is reversed.

ALEXANDER, C.J.; JOHNSON, MADSEN, SANDERS, BRIDGE, CHAMBERS, and OWENS, JJ.; and SMITH, J. PRO TEM., concur.